UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANDAL DUNKLIN,<br><br>Plaintiff<br><br>v.<br><br>NOAH MALLINGER, et al.,<br><br>Defendants | Case No. C-11-01275 JCS<br><br>**ORDER RE SUMMARY JUDGMENT MOTIONS**<br><br>Re: Docket Nos.: 64, 70 |

## I.  INTRODUCTION

This case involves the shooting of Plaintiff Randal Dunklin, an individual who is largely confined to a wheelchair, on January 4, 2011.  Mr. Dunklin asserts civil rights claims against the San Francisco Police Department officers involved in the shooting, as well as the City and County of San Francisco, under 42 U.S.C. § 1983 and the Fourth Amendment, alleging that excessive force was used against him.   Video footage taken by a surveillance camera and a passerby with an iPhone shows some of the events that led up to the shooting and both parties seek summary judgment in their favor based on that footage, as well as other undisputed facts.  Plaintiff has filed a Motion for Partial Summary Judgment ("Plaintiff's Motion").  Defendants have filed a Motion for Summary Judgment or in the Alternative Partial Summary Judgment ("Defendants' Motion").  A hearing on the Motions was held on Friday, March 8, 2013 at 9:30 a.m.  For the reasons stated below, Plaintiff's Motion is DENIED.  Defendants' Motion is GRANTED.[1]

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

II.     **BACKGROUND**

A.      **Factual Background**[2]

Plaintiff Randal Dunklin is a 57 year-old man whose right leg was weakened by polio as a child.  Joint Statement  ¶ 20.  Although Mr. Dunklin can stand and walk with crutches for short distances, he has used a manual wheelchair for mobility for the last several years.  *Id*.  ¶ 21.  The events that form the basis of Mr. Dunklin's claims occurred on January 4, 2011.  However, certain undisputed facts about events that occurred in the preceding days provide useful context.[3]

On December 20, 2010, Mr. Dunklin was detained by San Francisco Police Officers under Health and Institutions Code Section 5150 for being a danger to himself and was admitted to California Pacific Medical Center ("CPMC").  *Id*. ¶22;  Declaration of Blake Loebs in Support of Motion for Summary Judgment/Partial Summary Judgment ("Loebs Decl."),  Ex. C.  On December 29, 2010, Mr. Dunklin was discharged from CPMC.  Joint Statement ¶23.  Once released, Mr. Dunklin went to the Treatment Access Program ("TAP") in the Department of Public Health ("DPH") building located at 1380 Howard Street, San Francisco.  TAP referred Mr. Dunklin to an Alcoholics Anonymous treatment center, where he stayed for three days.  *Id*. ¶24.  TAP had previously arranged for Mr. Dunklin to attend an orientation at Walden House (a San Francisco substance abuse treatment facility) on January 3, 2011.  *Id*.  ¶25.  Unfortunately, Mr. Dunklin missed the orientation because on January 1, 2011, he received his social security check,

---

[2] Unless otherwise stated, the facts set forth below are undisputed.  They are taken, largely verbatim, from the Joint Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment/Partial Summary Judgment and the Supplemental Joint Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment/Partial Summary Judgment.  Because the paragraph numbering of the Supplemental Joint Statement picks up where that of the original Joint Statement leaves off, the Court refers to the two documents collectively as "Joint Statement."

[3] The Court notes that Plaintiff objects to the evidence introduced by Defendants relating to events prior to January 4, 2013 on the ground that the information was not known to the officers involved in the alleged use of excessive force against Dunklin.  *See* Plaintiff's Opposition at 5-6 (objecting to Defendants Motion at 2:17-3:22, citing *Graham v. O'Connor*, 490 U.S. 386 (1989)).  Because the Court does not rely on this evidence, it need not rule on Plaintiff's objection.  Plaintiff also objects to evidence in the Jail Medical Records regarding statements made by Plaintiff several days after the shooting occurred.  That evidence has no bearing on the issues before the Court and therefore the Court also does not rely on that evidence or rule on Plaintiff's objection; nor does it summarize it here.

United States District Court
Northern District of California

left the treatment facility and went on a three-day crack binge. *Id.* ¶26.

On January 4, 2011, Mr. Dunklin woke up in the alley next to 1380 Howard, angry at himself for missing the Walden House orientation. *Id.* ¶27. This was the third such orientation that Mr. Dunklin had missed for the same reason – the orientations were scheduled near the first of each month, when he receives his social security check, and each time he had used the checks to purchase crack, resulting in crack binges that lasted for several days. *Id.* ¶28.

After TAP opened, Mr. Dunklin went inside the DPH building seeking services. *Id.* ¶29.[4] Mr. Dunklin was told that to get into the program, he would have to attend an orientation which was to be held just after the first of February. *Id.* Mr. Dunklin became very upset, stormed outside, smoked a cigarette and then "went crazy on the parking meter" with his knife in front of 1380 Howard. *Id.* ¶¶30-31. Mr. Dunklin also used his knife to puncture the tires of a nearby City vehicle. *Id.* ¶33. The knife that Mr. Dunklin was using was a 200 millimeter (7.9 inch) Leatherman knife with a locking blade. *Id.* ¶ 32. Mr. Dunklin also threw a large chunk of concrete against the DPH building twice and once it landed close to a pedestrian. *Id.* ¶34.

Beginning at approximately 10:16 a.m., three 911 calls were made complaining about Mr. Dunklin's behavior in front of 1380 Howard. *Id.* ¶ 36. The first 911 call came at approximately 10:16 a.m. from a DPH employee complaining that a person in a wheelchair was throwing large rocks at individuals on the street in front of 1380 Howard. *Id.* ¶37. The second 911 call came at approximately 10:23 a.m. and was made by the same employee. *Id.* ¶38. The caller stated that Mr. Dunklin now had a buck knife that he was using to pry at parking meters and that he had "been aggressive toward passers by." *Id.* The third 911 call came at approximately 10:28 a.m. *Id.* ¶39. This time, a different employee from 1380 Howard called 911, stating "Can they hurry up? Because this guy has a knife, and we have people coming out of the building, and this guy's behaving very threatening." *Id.*

At around 10:30 a.m., San Francisco Police Officer Raymond Koenig responded on his

---

[4] Joint Statement ¶ 29 suggests the events occurred on January 3, 2011, but all of the other undisputed facts make clear that they took place on January 4, 2011. Accordingly, the Court presumes that the date in paragraph 29 is a typographical error.

United States District Court
Northern District of California

1  motorcycle to 1380 Howard Street and made contact with Mr. Dunklin.  *Id*. ¶1.  At the same time

2  that Officer Koenig was responding, patrol officers equipped with an Extended Range Impact

3  Weapon ("ERIW or Less-Lethal") were also dispatched.  *Id*. ¶2.  When Officer Koenig arrived, he

4  suggested that the additional unit with the Less-Lethal be put on hold, pending his evaluation.  *Id*.

5  ¶3.  Officer Koenig initially believed that the situation was under control and declared a Code 4,

6  which meant no more assistance was necessary, but after further investigation, Officer Koenig

7  learned that Mr. Dunklin had punctured the tires on a City car with a knife and he asked that a

8  police vehicle be dispatched to transport Mr. Dunklin.  *Id*. ¶ 5.  After additional contact with Mr.

9  Dunklin, in which he waived his knife at Officer Koenig and refused to relinquish it, Officer

10  Koenig revised his initial assessment and stated over the radio "this guy's getting a little goofy

11  with this knife. We might have to have Less-Lethal come by here."  *Id*. ¶ 6.

12       At about 10:30 a.m., four members of the San Francisco Police Department's Fugitive

13  Recovery Team ("FRET"), Officer Terence Saw, Sergeant Noah Mallinger, Officer Benjamin

14  Pagtanac and Officer Roselo Pascua, were riding together in an unmarked San Francisco police

15  vehicle when Officer Saw alerted the other officers to a call he heard on the police radio that an

16  individual in their vicinity (1380 Howard Street) had a knife.  *Id*. ¶ 7.  FRET is a division in the

17  San Francisco Police Department primarily responsible for the arrest and apprehension of

18  fugitives.  *Id*. ¶8.  FRET officers also frequently act as back-up to patrol officers.  *Id*.  The FRET

19  officers stopped about a half-block past 1380 Howard Street.  *Id*. ¶ 9.  They observed that Officer

20  Koenig was responding to the call by himself and decided to assist.  *Id*.

21       Officer Saw, Sergeant Mallinger and Officer Pascua exited the car and walked toward Mr.

22  Dunklin and Officer Koenig.  *Id*. ¶ 10.  After the officers exited the car, Officer Pagtanac backed

23  the car to the front of 1380 Howard Street.  *Id*., ¶ 11.  As Sergeant Mallinger and Officer Saw

24  approached Mr. Dunklin, they saw him seated in his wheelchair holding a large buck knife with an

25  open and locked blade.  *Id*. ¶ 12.  The officers overheard Officer Koenig order Mr. Dunklin to

26  drop the knife and Mr. Dunklin refused.  *Id*. ¶ 13.  The events that immediately followed were

27  captured, in part, by a video surveillance camera at 1380 Howard Street  ("the Howard Street

28  Video") but  are characterized differently by the parties.  *Id*., ¶ 14; *see also* Declaration of Craig

Fries in Support of Motion for Summary Judgment/ Partial Summary Judgment ("Fries Decl."), Ex. B.

According to Plaintiff, Officer Saw, without communicating with Officer Koenig, approached Mr. Dunklin and used his pepper-spray on him; Mr. Dunklin stabbed Officer Saw in response. Plaintiff's Motion at 2 (citing Declaration of John Houston Scott in Support of Plaintiff's Memorandum of Points and Authorities Motion for Partial Summary Judgment ("Scott Motion Decl."), Ex. D (Saw Dep.) at 92, 149-152). [5]

According to Defendants, Officer Saw, along with Sergeant Mallinger and Officer Pascua, stopped about 10 to 15 feet from Mr. Dunklin; Officer Saw ordered Mr. Dunklin to drop the knife, but Dunklin refused. Defendant's Opposition at 5 (citing Declaration of Sergeant Noah Mallinger in Support of Motion for Summary Judgment/Partial Summary Judgment ("Mallinger Decl."), ¶ 8; Declaration of Officer Terence Saw in Support of Motion for Summary Judgment/Partial Summary Judgment ("Saw Decl."), ¶ 8; Declaration of Officer Roselo Pascua Support of Motion for Summary Judgment/Partial Summary Judgment (Pacua Decl.), ¶ 8; Loeb Decl., Ex. A (Dunklin Dep.) at 195-196). Defendants contend that Dunklin then "quickly propelled his wheelchair in the direction of Officer Pascua and Officer Saw," holding his knife in his right hand, and took a swing with his knife at Officer Pascua when he got close enough to Officer Pascua." *Id*. (citing Saw Decl. ¶9; Mallinger Decl. ¶9, Pascua Decl. ¶ 10; Loeb Decl., Ex. A (Dunklin Dep.) at 330:25-331:6). Defendants further assert that after swinging with his knife at Officer Pascua, Mr. Dunklin changed direction and "quickly propelled himself toward Officer Saw." *Id*. at 6 (citing Saw Decl. ¶9; Mallinger Decl. ¶9; Pascua Decl. ¶10). Defendants assert that "[a]fter retreating, Officer Saw pepper-sprayed Dunklin, but Dunklin continued to advance with the knife in his hand." *Id*. (citing Saw Decl. ¶9; Mallinger Decl. ¶9). According to Defendants, "Dunklin then rolled into Officer Saw pinning him against a parking meter, rose from the seat of

---

[5] Plaintiff states in a footnote that "Dunklin was later acquitted by a jury of stabbing Saw because he acted in self-defense." *Id*. at 4 n. 4. Plaintiff does not offer evidence supporting this assertion. In any event, a criminal acquittal is not binding in a civil action under the doctrine of collateral estoppel because of the different burdens of proof in each. *See U.S. v. One Assortment of 89 Firearms*, 465 U.S. 354, 362 (1984).

his wheelchair, and stabbed Officer Saw in the upper left arm." *Id.* (citing Saw Decl. ¶9).

It is undisputed that Officer Saw's stab wound needed five to seven stiches on the interior and 15 stitches on the exterior. Joint Statement ¶ 40. It is also undisputed that had Mr. Dunklin stabbed Officer Saw a few inches to the right, he could have punctured Officer Saw's bullet-proof vest and stabbed Officer Saw in the heart. *Id.* ¶ 42.

After he stabbed Officer Saw, Mr. Dunklin wheeled himself around the corner of Howard Street onto 10th Street in an apparent attempt to flee. *See* Plaintiff's Motion at 2 ("Dunklin fled the scene of the stabbing and wheeled himself around the corner of Howard Street and started down 10th Street"); Defendants' Motion at 6 ("After stabbing Officer Saw, Dunklin rolled towards, and then into, 10th Street, in an apparent attempt to flee"). While Mr. Dunklin was on 10th Street, uniformed Officers Courtney Smith and Ernesto Linares arrived on scene with the ERIW/Less-Lethal weapon. *Id.* ¶ 15. Some of the events that occurred on 10th Street were captured by a civilian, who shot footage with his iPhone ("the iPhone Video"). Again, however, the parties characterize what happened at this point quite differently.

Plaintiff describes the events that occurred on 10th Street as follows:

> Dunklin retreated in his wheelchair and was followed around the corner on to 10th Street by a number of officers in plain clothes, including Mallinger and Saw. Officer Koenig assumed the role of directing traffic and Officers Smith and Linares, in uniform, arrived on the scene with the less-lethal ERIW weapon. Of the four FRET officers present, including Sergeant Mallinger, no one assumed command or control of the situation. There [was] no effort to coordinate a plan or strategy to detain and control Dunklin. (Mallinger depo, 73:13-76:24; and Saw depo, 222:10-225:6) None of the officers confronting Dunklin took a position of cover.
>
> It must be presumed that the six officers now confronting Dunklin have deliberately taken positions in the street, relative to Dunklin, they believe are safe from the threat posed by the knife. Dunklin is shot by Officer Smith with the ERIW. Dunklin immediately reacts by moving his right arm in a horizontal, counter clock wise movement and tosses the knife on the ground. The knife skids across the pavement toward one of the officer's feet. Mallinger claims it cut his boot.
>
> After Dunklin lets go [of] the knife Mallinger and Saw fire lethal rounds – striking Dunklin in his right flank as he is turning his wheelchair in a counter clockwise motion away from the officers. One of the bullets also hits Dunklin's penis.

United States District Court
Northern District of California

1    Plaintiff's Opposition at 4-5.

2          Defendants describe the events that occurred on 10th Street as follows:

3                Either or both [Officers] Smith and Linares gave Dunklin additional
                 orders to drop his knife and stated that if he did not comply, he
4                would be shot with the ERIW/Less-Lethal shotgun. (Saw Decl. ¶21;
                 Mallinger Decl. ¶14.) Dunklin refused to comply, and Officer Smith
5                fired the ERIW/Less-Lethal weapon at Dunklin. (Saw Decl. ¶22;
                 Mallinger Decl. ¶15.) Immediately after Officer Smith shot Dunklin
6                with the ERIW/Less-Lethal weapon, Dunklin began lowering his
                 arms and the knife. (Saw Decl. ¶23; Mallinger Decl. ¶16.) Dunklin
7                then quickly threw the knife in the direction of Sergeant Mallinger,
                 Officer Saw and Officer Pagtanac with great force. (Saw Decl. ¶23;
8                Mallinger Decl. ¶16.) Seeing that Dunklin was throwing the knife at
                 them, in fear of their lives, and in an attempt to keep Dunklin from
9                killing them or anyone else, Sergeant Mallinger and Officer Saw
                 reacted to this lethal threat by each firing one shot at Dunklin. (Saw
10               Decl. ¶24; Mallinger Decl. ¶17). Dunklin was struck by both bullets.
                 (Dunklin Depo. 3565:11-13.)

11

12   Defendants' Motion at 8-9.

13         The parties agree on the following facts relating to the iPhone Video.

14               The iPhone Video begins when Dunklin is already on 10th Street,
                 well after he stabbed officer Saw. The beginning of the iPhone
15               Video, left to right, shows Officer Koenig wearing a police uniform
                 and a motorcycle helmet. Sergeant Mallinger is shown wearing a
16               plaid, flannel shirt with light pants, then Dunklin is shown in his
                 wheelchair. Officer Pascua is shown in the middle, closest to the
17               camera, wearing a black jacket, dark jeans and a dark beanie cap.
                 Officer Pagtanac is shown just in front of Officer Pascua, wearing a
18               long tan shirt and dark jeans and a baseball hat. Officer Saw is
                 shown at the far right, wearing a black jacket and dark jeans.

19

20   Joint Statement ¶ 16. Further, the timing of certain events has been determined by Defendants'

21   expert in video technology, Mr. Fries, who added an overlay on the video to display the time to

22   the second and a frame counter. *Id*. ¶ The frames occur at 15 frames per second. *Id.* Mr. Fries

23   determined that although Sergeant Mallinger's shot was in reaction to Mr. Dunklin's motion to

24   throw the knife, he did not actually pull the trigger on his gun until approximately .87 seconds

25   after Mr. Dunklin first began to move his hand holding the knife forward in a throwing motion.

26   *Id.* ¶ 18.  The iPhone Video shows that Officer Saw also fired in reaction to Mr. Dunklin throwing

27   the knife, firing approximately 1.67 seconds after Mr. Dunklin first begins to move his hand

28   forward in a throwing motion.  *Id*. ¶19.

After the shots were fired, officers handcuffed Mr. Dunklin and rendered first-aid. *Id.* ¶ 47. Mr. Dunklin testified in his deposition that it took him a year to recover from the injuries he sustained. Loeb Decl., Ex. A (Dunklin Dep.) at 378.

**B.     Procedural Background**

**1.     The Complaint**

Plaintiff filed this action on March 16, 2011 and filed a First Amended Complaint ("FAC") on December 8, 2011. In the FAC, Dunklin asserts five claims under 42 U.S.C. § 1983 and one California state law claim. In Claim One, Plaintiff alleges that Officer Saw and Sergeant Mallinger violated his Fourth Amendment rights when they shot him because they used excessive force. FAC ¶¶26-27. In Claim Two, Plaintiff alleges that Officer Saw and Sergeant Mallinger violated his Fourteenth Amendment rights because they acted with deliberate indifference to Dunklin's health and welfare or with a purpose to harm unrelated to a legitimate police purpose. In Claims Three, Four and Five, Plaintiff asserts claims against the City and County of San Francisco ("the City") under *Monell v. New York City Dep't of Public Servs.*, 436 U.S. 658 (1978) based on allegations that the City: 1) inadequately trains its officers; 2) has an unconstitutional *de facto* policy that resulted in the shooting; 3) ratified the allegedly unconstitutional acts of Officer Saw and Sergeant Mallinger. *Id.* ¶¶ 30-35.

In support of the inadequate training claim, Plaintiff alleges that "Police officers in San Francisco are more likely to come into contact with mentally disturbed persons than officers in any other county in California [and that] [p]rior to the shooting the San Francisco Police Department maintained training policies that were not adequate to handle usual and recurring situations involving persons suffering an apparent mental crisis." *Id.* ¶¶ 17-18. As to the claim that the City ratified the conduct of Defendants Saw and Mallinger, Plaintiff alleges that following an investigation of the shooting, "[i]t was determined by the Chief of Police that the shooting of the Plaintiff by Defendants Mallinger and Saw was within Department policy." *Id.* ¶ 20.

Finally, in Claim Six, Plaintiff alleges that all Defendants violated his rights under California Civil Code Section 51.7 to be free from violence against a person because of his disability and medical condition. *Id.* ¶¶36-38.

In his Prayer for Relief, Plaintiff seeks compensatory and general damages against all defendants, as well as an award of punitive and exemplary damages against Defendants Mallinger and Saw.  FAC at 7.

### 2.   Defendants' Motion for Summary Judgment

#### a)   Motion

In their summary judgment motion, Defendants seek summary judgment on all of Plaintiff's claims.  Defendants' Motion at 1.

#### (1)   Fourth Amendment Claim

Defendants contend that Plaintiff's Fourth Amendment claim against Defendants Saw and Mallinger fails because: 1) the undisputed evidence, namely, the iPhone Video, establishes as a matter of law that the force that was used was reasonable; and 2) both officers are entitled to qualified immunity because there is no clearly established law from which a reasonable officer would have known that the force used under the facts of this case was unreasonable.  *Id.* at 1, 12-19.

Defendants contend that even if Mr. Dunklin was no longer holding the knife at the precise moment Defendants Mallinger and Saw shot him, their actions were reasonable under the Fourth Amendment because at the time that they *began* to react to Mr. Dunklin, he was presenting a deadly threat, thus justifying the use of lethal force.  *Id.* at 15 (citing *Billington v. Smith*, 292 F.3d 1177, 1185 (9th Cir. 2002); *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir.1996), overruled on other grounds, *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997)); *Garcia v. United States*, 826 F.2d 806, 812 (9th Cir. 1987)).   According to Defendants, "officers are not machines and in stressful, life threatening situations, cannot be charged with making a real-time assessment as to the precise moment a threat stops being a threat."  *Id.* (citing  *Anderson v. Russell*, 247 F.3d 125, 132 (4th Cir. 2001); *Rodgers v. Smith*, 188 Fed. Appx. 175, 176-80 (4th Cir. 2006);  *Maradiaga v. Wilson, 518 F.Supp.* 2d 760, 768-69 (D.S.C. 2007);  *Webb v. Raleigh County Sheriff's Dept.*, 761 F.Supp. 2d 378, 392-93 (S.D.W.Va. 2010)).  Defendants assert that *Berube v. Conley*, 506 F.3d 79 (1st Cir. 2007), in which a police officer fired on a man who had charged her with a hammer in his hand and continued to shoot even after the man was on the

United States District Court
Northern District of California

9

1   ground, is on point.  *Id*. at 15-16.  In that case, the court held that the officer's actions were

2   reasonable under the Fourth Amendment because the events occurred in a "very brief time" and

3   the officer made a "split-second judgment in responding to an imminent threat."  *Id*.  (citing 506

4   F.3d at 85).

5       On the question of qualified immunity, Defendants cite the two-step inquiry which asks: 1)

6   whether a constitutional violation occurred; and 2) "[i]f an official could reasonably have believed

7   her actions were legal in light of clearly established law and the information she possessed at the

8   time, she is protected by qualified immunity."  *Id*. at 17 (citing *Franklin v. Fox*, 312 F.3d 423, 437

9   (9th Cir. 2002)).   According to Defendants, the "clearly established law" standard is highly

10  deferential.  *Id.* (citing *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074, 2085 (2011); *Reichle v. Howards*, __

11  U.S.__, 132 S.Ct. 2088, 2096 (2012)).  Further, Defendants contend, to overcome qualified

12  immunity, a plaintiff must point to cases involving similar facts.  *Id*. at 18 (citing *Brosseau v.

13  Haugen*, 543 U.S. 194, 200-201 (2004)).  According to Defendants, there is no such case here and

14  indeed, in a case involving even more extreme facts, *Willingham v. Loughnan*, the Eleventh

15  Circuit held that officers were entitled to qualified immunity where each officer involved shot an

16  individual four times after she had just thrown a knife at them.  *Id*. at 18-19 (citing 321 F.3d 1299,

17  1303 (11th Cir. 2003)).

18                    **(2)      Fourteenth Amendment Claim**

19      Defendants assert that Plaintiff's Fourteenth Amendment claim fails because excessive

20  force claims are governed by the Fourth Amendment and not the Fourteenth Amendment.  *Id*. at

21  19-20 (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)).

22                    **(3)      *Monell* Claims**

23      Defendants contend that they are entitled to summary judgment on all of Plaintiff's *Monell*

24  claims for the same reason they are entitled to summary judgment on Plaintiff's Fourth

25  Amendment Claim, namely, that the undisputed facts establish, as a matter of law, that the conduct

26  of the Defendant officers was reasonable.  *Id*. at 20.  In addition, Defendants assert that the

27  undisputed facts establishes that the City did not act with deliberate indifference to Plaintiff's

28  constitution rights – the standard that they assert is applicable to all three of Plaintiff's *Monell*

United States District Court
Northern District of California

10

claims.  *Id.* at 20 (citing *Monell*, 436 U.S. at 691;  *Board of County Comm'rs of Bryan County v. Brown*,  520 U.S. 397, 405 (1997); *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991)).

With respect to Plaintiff's *Monell*  claim based on alleged inadequate training, Defendants further assert that the deficiency in training must be "so 'obvious' that it reflects a conscious choice by the supervisor to expose the plaintiff to a likely constitutional violation."  *Id.* at 21 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989);  *Davis v. City of Ellensburg*, 869 F.2d 1230, 1234 (9th Cir. 1989);  *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991)). Moreover, Defendants argue, a claim for inadequate training requires a "very close causal connection" between the alleged deficiency and the plaintiff's injury.  *Id.* (citing *City of Canton*, 489 U.S. at 387).  According to Defendants, "Plaintiff does not have any evidence that Sergeant Mallinger's or Officer Saw's training was in any way deficient, much less [that there is] a 'very close causal connection' between the alleged deficiency and his injury."  *Id.*  Defendants also offer evidence that the training received by Defendants Mallinger and Saw meets or exceeds the California Peace Officers Standards and Training ("POST") requirements for peace officers.  *Id.* (citing Declaration of Don Cameron in Support of Motion for Summary Judgment/ Partial Summary Judgment  (Cameron Decl.) ¶ 1, Ex. A (Cameron Expert Report)).

Defendants argue that Plaintiff's *Monell* claim based on an alleged *de facto* policy also fails as a matter of law.  To prevail on such a claim, Defendants assert, Plaintiff must establish that Sergeant Mallinger's and Officer Saw's allegedly unconstitutional acts were undertaken pursuant to a practice "so permanent and well settled as to constitute a 'custom or usage' with the force of law."  *Id.* at 21 (citing *Monell*, 436 U.S. at 691).  Further, this practice must be the "moving force" behind the constitutional violation, Defendants contend.  *Id.* (citing *City of Canton*, 489 U.S. at 389).  According to Defendants, Plaintiff has "no evidence" of such an unconstitutional practice. *Id.*

As to the *Monell* claim based on ratification of the alleged unconstitutional conduct by a final policymaker, Defendants assert this claim fails because Plaintiff must show that a final policymaker has "found that unconstitutional conduct occurred, and made a conscious affirmative choice to approve it."  *Id.* at 22 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988);

United States District Court
Northern District of California

11

*Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992)).  Here, Defendants contend, "Plaintiff has no evidence that a final policymaker found that the defendant officers engaged in unconstitutional conduct and officially approved that conduct."  *Id*.

### (4)    Section 51.7 Claim

Defendants seek summary judgment on Plaintiff's claim under California Civil Code Section 51.7, which creates a right to be free from violence based on disability, on the ground that there is no evidence that Plaintiff's disability was a motivating reason for the Defendant officers' conduct.  *Id*. (citing *Austin B. v. Escondido Union School Dist.*, 149 Cal.App. 4th 860, 881 (2007)).

### (5)    Request for Punitive Damages

Defendants assert that punitive damages are not available on Plaintiff's claims because under federal law, punitive damages require a plaintiff to prove that the conduct at issue was "malicious, oppressive or in reckless disregard of the Plaintiff's rights," and under California law, punitive damages require a showing of "malice, oppression or fraud."  *Id*. at 23 (citing Ninth Circuit Model Jury Instructions, § 5.5;  California Civil Jury Instruction No. 3940).  According to Defendants, Plaintiff has no evidence that any Defendant meets these standards.  *Id*.

### b)    Opposition

In his Opposition brief, Plaintiff concedes that his Fourteenth Amendment claim (Claim Two), fails as a matter of law and therefore dismisses that claim.  Plaintiff's Opposition at 9 n. 9. Plaintiff does not address Defendants' argument relating to his Section 51.7 claim (Claim Six) or point to any evidence that the conduct of the Defendant officers was motivated by Plaintiff's disability.  Therefore, Defendants are entitled to summary judgment on that claim as well. Similarly, he does not address Defendants' argument as to the availability of punitive damages. Therefore, the Court dismisses Plaintiff's request for punitive damages.  The remaining claims in dispute are Plaintiff's Fourth Amendment Claim (Claim One) and his *Monell* claims (Claims Three through Five).  As to those claims, Plaintiff raises several objections to the evidence cited by Defendants in their Motion.  *Id*. at 5-8.

First, Plaintiff objects to Defendants' introduction of evidence as to his history and background, as well as events that occurred on Howard Street, on the ground that Officer Saw and

Sergeant Mallinger were not aware of these facts at the time of the alleged use of excessive force. *Id*. at 5-6.  Because the relevant inquiry looks only at the facts that were known to the defendants at the time of the alleged use of excessive force, Plaintiff contends, all of this evidence is irrelevant to Plaintiff's Fourth Amendment claim.  *Id*. (citing *Graham v. Connor*, 490 U.S. 386 (1989)).

Second, Plaintiff objects to Defendants' interpretations of the two videos, though he does not object to the videos themselves or to "Defendants' effort to identify the officers in the video in terms of understanding who did what."  *Id*. at 6-7.  In particular, Plaintiff contends that the Howard Street Video does not show that Mr. Dunklin was the aggressor in the moments leading up to the stabbing of Officer Saw, as Defendants contend, but rather, that Officer Saw was the aggressor and that Mr. Dunklin lashed out in self-defense.  *Id*.  According to Plaintiff, the pepper spraying and stabbing that occurred on Howard Street is relevant because it is part of the totality of the circumstances that must be considered to determine whether the amount of force used by Defendants when they shot Plaintiff was reasonable under the Fourth Amendment.  *Id*.  Plaintiff asserts that the stabbing put Officer Saw and Sergeant Mallinger on alert that Mr. Dunklin was capable of using the knife and might attempt to stab an officer or throw the knife at them.  *Id*. Similarly, Plaintiff contends that Defendants have mischaracterized the iPhone Video, particularly with regard to the description of Mr. Dunklin's throwing of the knife.  *Id*. at 7-8.  Plaintiff contends that it is irrelevant whether the officers subjectively believed that Mr. Dunklin was throwing the knife at them given that the video shows that he moved his arm in reaction to being shot.  *Id*.  Plaintiff therefore objects to Defendants' interpretation of the iPhone Video to the extent it is inconsistent with Plaintiff's interpretation of that video.  *Id*.

Finally, Plaintiff objects to the expert report offered by Defendants' expert, Mr. Cameron, addressing the reaction time of the officers and opining that the officers acted in self-defense.  *Id*. at 8.  Plaintiff argues that Mr. Cameron's opinions are irrelevant because it was foreseeable that Mr. Dunklin might throw the knife and the officers had taken safe positions with that eventuality in mind.  *Id*. at 8.

United States District Court
Northern District of California

**(1)    Fourth Amendment Claim**

Plaintiff rejects Defendants' contentions that: 1)  Officer Saw and Sergeant Mallinger acted reasonably under the Fourth Amendment; and 2) Defendants Saw and Mallinger are entitled to qualified immunity on the Fourth Amendment claim because there was no well-established right that would have put those Defendants on notice that their acts constituted excessive force.  *Id*. at 8-9.  According to Plaintiff, the video footage offers the best evidence of what occurred and it shows, as a matter of law, that excessive force was used.  *Id*. at 9 (citing *Scott v. Harris*, 550 U.S. 372 (2007)).  Plaintiff notes that in *Scott v. Harris*, the question of whether the force used was reasonable was treated as an undisputed fact where there was video footage of the incident and argues that the same approach should be applied here.  *Id*.  Plaintiff  further asserts that the Court should reject Defendants' reliance on the subjective beliefs of the Defendant officers that their lives were threatened, as well as the expert testimony about reaction time, given that the video shows that the officers knew Mr. Dunklin might throw his knife and had taken safe positions during the encounter on 10th Street leading up to the shooting.  *Id*.  At a minimum, Plaintiff contends, there is a fact question as to whether the force used was reasonable.  *Id*.  Further, Plaintiff argues, Officer Saw and Sergeant Mallinger are not entitled to qualified immunity because it is well-established that the use of excessive force violates an individual's Fourth Amendment rights.  *Id*. (citing *Graham v. Connor*, 490 U.S. 386 (1989); *Tennessee v. Garner*, 471 U.S. 1 (1985)).

**(2)    *Monell* Claims**

Plaintiff rejects Defendants' contention that there is no evidence of inadequate training or a *de facto* policy that resulted in the alleged constitutional violation, asserting that there is substantial, undisputed evidence that San Francisco Police officers are trained to use whatever level of force they subjectively believe is necessary and to subsequently articulate a legal justification.  *Id*.  Plaintiff refers to this as a "de facto shooting policy" and argues that there is evidence that it was the "moving force" that led to the alleged deprivation of Plaintiff's Fourth Amendment rights.  *Id*. at 9-15.

As evidence of the City's policy, Plaintiff cites the deposition testimony of Dennis Quinn,

produced by Defendants as the person most knowledgeable with respect to the City's training of officers on use of force.  *Id.* at 10.  In particular, Plaintiff emphasizes Quinn's testimony that the training that officers are required to undergo every two years includes "branching," where officers are asked to respond to different scenarios – which are presented in a video produced by FATS Meggitt -- and  Mr. Quinn then determines if the officer has passed or not.  *Id.* (citing Declaration of John Houston Scott in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment or in the Alternative Partial Summary Judgment ("Scott Opposition Decl."), Ex. A (Quinn Dep.) at 28-34, 54-60, 67-72).  According to Plaintiff, Mr. Quinn testified that in some cases the officer can pass the same scenario by using or not using deadly force and a key element for determining whether the officer passes is whether he or she can articulate the reason for using deadly force.  *Id.* (citing Scott Opposition Decl., Ex. A (Quinn Dep.) at 42, 61-64, 76-77, 80-81 and 84).   Plaintiff further points to testimony by Mr. Quinn that: 1) he has not received training on how to determine whether an officer has passed or not; and 2) the officers are also trained in tactics and can pass or fail depending on whether they use "cover items" that are set up in the training room.   *Id.* at 11 (citing Scott Opposition Decl., Ex. A (Quinn Dep.) at 57-58, 69, 84-85).  Finally, Plaintiff points to the statement made by Officer Saw two days after the shooting, on January 6, 2011, that he is trained to say that he feared for his life when he shot someone.  *Id.* (citing Scott Opposition Decl., Ex. D (Saw Statement) at 63:13-64:11 ("I know it's very sterile terms saying scared, scared for my life, that's what we're all taught to say. ")).   All of this evidence, Plaintiff contends, constitutes an "admission by the City that its *de facto* shooting policy is not consistent with the law."  *Id.* at 11-12 (citing *City of Canton*, 489 U.S. at 389-90).

Plaintiff further asserts that this *de facto* policy was the moving force behind the deprivation of Mr. Dunklin's rights.  *Id.* at 12-13 (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1481 (1992)).  He contends that because Officer Saw and Sergeant Mallinger received the training described above, and given that inferences are drawn in favor of the non-moving party on summary judgment, there is at least a fact question as to whether the training policy resulted in the deprivation of Mr. Dunklin's Fourth Amendment right to be free of excessive force.  *Id.* at 13-14.

With respect to his ratification theory, Plaintiff seeks leave to conduct additional discovery

under Rule 56(d) of the Federal Rules of Civil Procedure. *Id*. at 15. Plaintiff points to SFPD General Orders 8.11 and 3.10, which require the investigation of officer-involved shootings and discharges, and asserts that there is circumstantial evidence that Police Chief Suhr made a recommendation to the Police Commission that the shooting of Mr. Dunklin was within policy. *Id*. (citing Scott Opposition Decl., Ex. E (Counsel's Joint Letter submitted to Court on September 28, 2012 & Exhibits A and B thereto)); *see also* Scott Opposition Decl., ¶¶ 7-8.[6] Because the Court denied Plaintiff's previous discovery request seeking leave to depose the Police Chief and individuals on the Firearm Discharge Review Board ("FDRB") who were involved in the investigation of the shooting, Plaintiff contends, he has not been able to determine whether the Police Chief was acting as final policy maker or instead, whether the Police Commission made the final decision approving the shooting as within policy. *Id*. Therefore, Plaintiff asks the Court to allow him to conduct additional discovery to oppose Defendants' summary judgment motion,

---

[6] In his declaration, Mr. Scott states as follows:

> 7. Beginning last spring Mr. Safire and I attempted to conduct discovery regarding plaintiff's ratification claim. We were initially told that the Firearm Discharge Review Board (FDRB) had not made a decision. After we obtained discovery of that event, we were told that the review process would not be complete until the OCC completed its review. In the meantime we noticed depositions of persons who participated in the FDRB process as well as Chief Suhr. The defendants opposed these efforts and the issue was brought to this court as a discovery dispute – shortly before the close of discovery. This court prevented plaintiff from deposing persons who participated in the FDRB process and Chief Suhr.

> 8. After the close of discovery we learned that the OCC completed its review. It is unknown what, if any action, was taken by final policymakers for the City after that event. Discovery closed. Two weeks ago defendants filed their motion for summary judgment as to all claims, including plaintiff's *Monell*/ratification claim. I contacted Blake Loebs and asked him if he would produce Chief Suhr and the OCC Director for deposition so that we could oppose the motion. He declined citing, among other things, the fact that discovery had closed. I indicated that we would raise the issue under Rule 56(d) and request a ruling from the court allowing discovery in order to oppose the motion on the ratification issue. It is still unclear whether Chief Suhr and/or the Police Commission is/are the final policymakers for purposes of the shooting in this case.

Scott Opposition Decl., ¶¶ 7-8.

1    namely, depositions of Chief Suhr and others involved in the decision to ratify the shooting.  *Id*. at

2    15-16.

3         Plaintiff also contends that Defendants have applied the wrong legal standard in suggesting

4    that a ratification would have occurred only if the Police Chief had actually found that the

5    Defendant officers had engaged in unconstitutional conduct (that is, that they did not actually fear

6    for their lives when they shot Dunklin and therefore acted unreasonably) and approved that

7    unconstitutional conduct.  *Id*. at 15-16.   According to Plaintiff, the law only requires that a final

8    policymaker "ratified the officers' act and the basis for it, that is, knew of and specifically

9    approved of the employee's act(s)."  *Id*. (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127

10   1988);  *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 985 (9th Cir. 2002)).

### c)    Safire Supplemental Declaration

12        On January 9, 2013, almost three weeks after Plaintiff submitted his Opposition brief and

13   two days before Defendants' reply brief was due, Plaintiff's counsel, Eric Safire, submitted a

14   supplemental declaration.  See Supplemental Declaration of Eric Safire in Support of Rule 56(d)

15   Request for Additional Discovery to Oppose Defendant's Motion for Summary Judgment as to the

16   Monell Claims ("Safire Supp. Decl.").  Attached to the declaration are copies of the San Francisco

17   Police Department's Firearm Discharge Review Board quarterly reports produced by the City in

18   response to Plaintiff's discovery requests, as well as a chart prepared by Mr. Safire purportedly

19   summarizing the contents of those reports.  *Id.*, Exs. A & B.  According to Mr. Safire, the finding

20   that the shooting of Mr. Dunklin was "within policy" is included in the quarterly reports.  *Id*. ¶ 4.

21   Mr. Safire states further:

> Other than one deposition of a PMK on the training issue and
> obtaining the Quarterly Reports (which are public record according
> to the San Francisco Police Department's General Order 3.10, dated
> 9/21/05) Plaintiff was precluded from conducting any discovery as
> to his *Monell* claims. Plaintiff believes that the Quarterly Reports are
> circumstantial evidence of the de facto policy as described by Mr.
> Quinn, the PMK. The Plaintiff seeks to explore this subject matter as
> part of the discovery requested regarding ratification in his
> opposition brief filed on December 21, 2012.

27   *Id*. ¶ 5.

28

United States District Court
Northern District of California

**d)      Reply**

In their Reply brief, Defendants contend that Plaintiff has failed to counter their description of the relevant events with specific facts and therefore, those facts are undisputed.  Defendants' Reply at 3-6.

With respect to the Fourth Amendment claim, Defendants reject Plaintiff's assertion that they are relying on the subjective perceptions of the officers, arguing that the undisputed facts show that a *reasonable* officer under the circumstances could have believed that Mr. Dunklin posed a threat to their safety.  *Id.* at 6.  Defendants further reject Plaintiff's assertion that the officers could not have felt threatened because they were at a safe distance and did not seek cover.  *Id.* at 7.  According to Defendants, this argument fails because it focuses on the subjective perceptions of the officers and also because it is based on the incorrect assumption that officers never put themselves in harm's way.  *Id.*  In fact, officers are charged with protecting the public, Defendants contend, and even if they make tactical errors and might have been able to avoid a confrontation, that is not a basis for finding a Fourth Amendment violation.  *Id.* at 7-8 (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998); *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002); *Fisher v. City of San Jose*, 558 F.3d 1069, 1076 (9th Cir. 2009)).  Similarly, Defendants assert, there is no duty to retreat in the face of a threat.  *Id.* at 8 (citing Cal. Penal Code § 835; *Reed v. Hoy*, 909 F.2d 324, 330-31 (9th Cir. 1989)).  Thus, even if the officers "recklessly or foolishly" put themselves in harm's way in attempting to arrest Mr. Dunklin, that is not relevant to the Fourth Amendment inquiry, Defendants argue, which only asks if the Defendants believed their safety was being threatened at the time of the shooting.  *Id.* at 9.

Defendants also contend that Plaintiff's reliance on the iPhone Video is misplaced.  *Id.*  According to Defendants, Plaintiff is arguing that because the video shows that no one was hurt when Mr. Dunklin threw the knife, the officers could not have felt threatened.  *Id.*  That argument fails, however, because the reasonableness inquiry focuses on what a reasonable officer on the scene would have believed rather than on what is known with 20/20 hindsight.  *Id.* (citing *Graham*, 490 U.S. at 396-97; *Long v. City and County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007); *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994)).  Thus, even where it is later found that

18

a suspect did not actually pose a threat, for example where the officer believed the suspect was armed but it was later found that the suspect had only an innocuous object, the use of force has been found to be reasonable, Defendants argue.  *Id.* at 10 (citing *Anderson v. Russell*, 247 3d 125, 130 (4th Cir. 2001); *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991)).  Here, Defendants contend, the officers' actions cannot be found unreasonable simply because Mr. Dunklin did not end up injuring anyone when he threw the knife.  *Id.*

On the question of qualified immunity, Defendants argue that Plaintiff has identified no case involving specific facts similar to those in this case that would have put the officers on notice that their conduct was unreasonable.  *Id.* at 10-11.  Further, they argue that Plaintiff did not address the *Willingham*  case or distinguish the *Berube* case cited by Defendants in their opening brief.  *Id.*  Instead, Defendants argue, Plaintiff wrongly asserts that there is no qualified immunity because the *general standards* governing excessive force would have been known to the Defendant officers.  *Id.*

Defendants reject Plaintiff's arguments in support of his *Monell* claims on several grounds.  First, they argue that Plaintiff has mischaracterized Mr. Quinn's testimony and the evidence as a whole when he contends that officers are trained: 1) to apply a subjective test to determining whether force is allowable; and 2) that a shooting is within policy so long as an officer can articulate their reasons for using force.  *Id.* at 12-13.  According to Defendants, Mr. Quinn's testimony establishes only that officers are required to have articulable reasons for using force, not that force is allowable so long as a reason is articulated.  *Id.*   They further point to the PowerPoint slides that are used for the training conducted by Mr. Quinn, which were produced to Plaintiff, reflecting that the officers are taught to apply an objective standard in determining whether force is reasonable.  *Id.* at 13 (citing Supplemental Declaration of Blake Loebs in Support of Defendants' Motion for Summary Judgment/Partial Summary Judgment ("Loebs Supp. Decl.), Ex. E (PowerPoint Slides (Ex. D to Quinn Dep.).

With respect to Plaintiff's ratification theory, Defendants reiterate their position that ratification only occurs if a final policymaker ratifies the "basis" for the act and that the basis was unconstitutional.  *Id.* at 14 (citing *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992)).

Defendants also reject Plaintiff's contention that he should be allowed to conduct further discovery, including deposing Police Chief Suhr. *Id*. According to Defendants, Plaintiff has had since October 18, 2012, when Plaintiff's first request to depose Chief Suhr was denied without prejudice, to seek leave to conduct that deposition but Plaintiff did not do so, instead waiting until after discovery closed to make the request. *Id*. at 14-15 (citing Loebs Supp. Decl.). In any event, Defendants assert, it is not enough that Police Chief Loebs believed the shooting was within policy; rather, Plaintiff must demonstrate that he "bought into Plaintiff's version of the case," according to Defendants. *Id*. at 15.

In Mr. Loebs' supplemental declaration, he responded to the late-filed Safire declaration, rejecting Mr. Safire's characterization of the discovery that had been provided in connection with Plaintiff's *Monell* claim. Mr. Loebs states:

> Eric Safire's statement in his declaration that "other than one deposition of a PMK on the training issue and obtaining Quarterly Reports . . . Plaintiff was precluded from conducting discovery as to his *Monell* claims," is simply untrue. Defendants produced all of the discovery sought by Plaintiff. The only discovery that Plaintiff was denied was Plaintiff's harassing request to depose three Deputy Chiefs, the Director of the Office of Citizen Complaints, the SFPD Range Master, a member of the Police Commission the lead Internal Affairs investigator and the Chief of Police, to discover their thoughts and impressions surrounding the recommendation of the Firearm Discharge Review Board's ("FDRB") to the Chief of Police that the shooting was within policy, even though most of these individuals were not even voting members of the FDRB and the FDRB was not the final policy maker. The Court correctly denied Plaintiff's request because Plaintiff was seeking to depose high-ranking officials (almost the entire command staff of the SFPD), who were not witnesses to anything, and who were not the final policy maker about their thoughts and impressions concerning this case.

*Id*. ¶ 6. Mr. Loebs also asserts that the chart provided by Mr. Safire that purportedly summarizes the Quarterly Reports is not an accurate summary of the cases discussed in those reports. *Id*. ¶ 7. In particular, Mr. Loebs points to one case description in which Mr. Safire stated that there was a "cover up" and identified the plaintiff's counsel in that case, even though neither is included in the reports. *Id*. In their Reply brief, Defendants object to the chart on the basis that is irrelevant, lacks foundation and is hearsay. Defendants' Reply at 13 n. 23.

United States District Court
Northern District of California

**3.**     **Plaintiff's Motion for Partial Summary Judgment**

**a)**     **Motion**

In his Motion, Plaintiff seeks summary judgment that  Officer Saw and Sergeant Mallinger used excessive force, as a matter of law, based on the video footage of the events on Howard Street and 10th Street.  *Id*. at 1.  According to Plaintiff, in determining whether the conduct of the Defendants was objectively reasonable, the Court must consider the totality of the circumstances, which includes the availability of alternative methods to subdue the suspect, demeanor of the suspect, and whether it is apparent that the individual is emotionally disturbed.  *Id*. at 5 (citing *Graham v. Connor*, 490 U.S. at 396; *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005); *Chew v. Gates*, 27 F.3d 1342, 1441 n. 5 (9th Cir. 1994); *Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008); *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001)).  The subjective beliefs of the officers are not relevant, Plaintiff contends, in determining whether the Defendant officers acted reasonably.  *Id*. at 6-8 (citing *Graham v. Connor*, 490 U.S. 386 (1989);  *Deorle*, 272 F.3d at 1281).  Plaintiff argues, as he did in his opposition brief, that the Court should follow the approach taken in *Scott v. Harris*, 550 U.S. 372 (2007) and treat the video footage as establishing the undisputed facts as to whether the force used was objectively reasonable.  *Id*. at 8-11. Plaintiff's interpretation of what these videos reflect is described above.

Plaintiff concedes that he has not found cases in which courts have relied on video footage to grant summary judgment in favor of a plaintiff alleging excessive force but cites numerous cases in which such footage has been relied upon as the basis for finding the use of force to be reasonable as a matter of law.  *Id*. at 10-11 (citing *Griffin v. Hardrick*, 604 F.3d 949, 955 (6th Cir. 2010); *Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009); *Beshers v. Harrison*, 495 F.3d 1260, 1262 n.1, 1268 (11th Cir. 2007), *Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008); *Turner v. Roach*, 2012 U.S. Dist. LEXIS 155810, *9 (E.D. Mo. Oct. 31, 2012); *Johnson v. Woods*, 2010 U.S. Dist. LEXIS 53045 (N.D.N.Y. Mar. 2, 2010); *Green v. Morse*, 2009 U.S. Dist. LEXIS 42368 (W.D.N.Y. May 18, 2009); *Flemming v. Kemp*, 2012 U.S. Dist. LEXIS 132255, *36-37 (N.D.N.Y. Aug. 30, 2012); *Saad v. City of Dearborn Heights*, 2012 U.S. Dist. LEXIS 88226, *23-24 (E.D. Mich. June 26, 2012); *Banks v. Twardesky*, 2011 U.S. Dist. LEXIS 25349, *17-19 (E.D. Mich.

Feb. 10, 2011); *Chavez v. Compton*, 2009 U.S. Dist. LEXIS 123544, *1 (D. Mont. Nov. 2, 2009), *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005); *Green v. Throckmorton*, 681 F.3d 853, 856 (6th Cir. 2012)).

Plaintiff also argues that he is entitled to summary judgment on his Fourth Amendment claim under the doctrine of *res ipsa loquitor*. *Id*. at 13-14. According to Plaintiff, under this doctrine, the undisputed facts show that the officers who shot Mr. Dunklin could not have reasonably feared for their lives given what can be seen in the video footage. *Id*. (citing *Karouni v. Gonzales*, 399 F.3d 1163, 1174 (9th Cir. 2005)).

Plaintiff also asks the Court to enter summary judgment that Defendants Mallinger and Saw are not entitled to qualified immunity. *Id*. at 14-16. According to Plaintiff, the doctrine of qualified immunity does not apply in this case because the "contours of the right to be free from excessive force have been well defined for decades." *Id*. at 15 (citing *Tennessee v. Garner*, 471 U.S. 1, 12 (1985)). Under these standards, Plaintiff contends, a reasonable officer would have known that shooting Mr. Dunklin, under the circumstances, constituted excessive force. *Id*. at 16.

### b)      Opposition

Defendants' Opposition mirrors the sections of their Motion addressing Plaintiff's Fourth Amendment Claim and the *Monell* claims and therefore the Court summarizes Defendants' arguments only briefly here.   As to the Fourth Amendment claim, Defendants argue that the actions of the officers are judged based on what was known to them at the time and that when a suspect is threatening officers with a knife, lethal force is generally found to be reasonable. *Id*. at 12 (citing *Martinez v. County of Los Angeles*, 47 Cal.App.4th 334, 345 (1996); *Estate of Larsen v. Murr*, 511 F.3d 1255, 1261-62 (10th Cir. 2008); *MacEachern v. City of Manhattan Beach*, 623 F.Supp. 2d 1092, 1104 (C. D. Cal. 2009)). This is true even where an individual appears to be mentally disturbed, Defendants assert, because "the officers have an overriding concern to secure that individual's deadly weapon." *Id*. (citing *Blanford v. Sacramento County*, 406 F.3d 1110, 1117-18 (9th Cir. 2005); *Long v. City and County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007)). Defendants further assert that the timing of the officers' response need not be perfectly calibrated to be reasonable. *Id*. at 14 (citing *Rodgers v. Smith*, 188 Fed. Appx. 175, 176-80 (4th Cir. 2006);

1   *Maradiaga v. Wilson*, 518 F.Supp. 2d 760, 768-69 (D.S.C. 2007); *Webb v. Raleigh County*

2   *Sheriff's Dept.*, 761 F.Supp. 2d 378, 392-93 (S.D.W.Va. 2010);  *Berube v. Conley*, 506 F.3d 79

3   (1st Cir. 2007)).

4          As to qualified immunity, Defendants point to recent cases that they contend afford a great

5   deal of deference to public officials.  *Id.* at 17 (citing *Reichle v. Howards*, __ U.S__, 132 S.Ct.

6   2088, 2096 (2012); *Padilla v. Yoo*, 678 F.3d 748, 758 (9th Cir. 2012)).  They also argue that to

7   defeat qualified immunity, Plaintiff must cite cases with similar facts to show that there was an

8   established constitutional right of which a reasonable officer would have been aware.  *Id.*

9   Defendants contend Plaintiff has not cited any such case and moreover, that in a factually similar

10  case, *Willingham v. Loughnan*, 321 F.3d 1299, 1303 (11th Cir. 2003), the court held that the force

11  used was reasonable.  *Id.*

12         Finally, Defendants assert that the doctrine of *res ipsa loquitor* deals only with permissible

13  inferences from unexplained events and is inapplicable here because there is no unexplained event.

14  *Id.* at 24-25 (citing *Johnson v. U.S.,*  333 U.S. 46, 49 (1948)).

15                     **c)      Reply**

16         In his Reply brief, Plaintiff contends that Defendants have improperly relied on facts

17  unknown to Officer Saw and Sergeant Mallinger, focused on their subjective beliefs, and relied on

18  cases that did not involve individuals in wheelchairs, including the *Willingham*  case.  Plaintiff's

19  Reply at 1.   Plaintiff raises the same evidentiary objections asserted in his Opposition brief,

20  summarized above.  *Id.* at 4-7.

21  **III.     ANALYSIS**

22         **A.     Legal Standard on Summary Judgment**

23         Summary judgment on a claim or defense is appropriate "if the movant shows that there is

24  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

25  law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

26  the absence of a genuine issue of material fact with respect to an essential element of the non-

27  moving party's claim, or to a defense on which the non-moving party will bear the burden of

28  persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

United States District Court
Northern District of California

23

United States District Court
Northern District of California

1   made this showing, the burden then shifts to the party opposing summary judgment to designate

2   "specific facts showing there is a genuine issue for trial."  *Id.*  On summary judgment, the court

3   draws all reasonable factual inferences in favor of the non-movant.  *Scott v. Harris*, 550 U.S. 372,

4   378 (2007).

5         "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot

6   present facts essential to justify its opposition, the court may  . . . defer considering the motion"

7   and may also "allow time to obtain affidavits or declarations or to take discovery." Fed.R.Civ.P

8   56(d);[7] *see also Tatum v. City and County of San Francisco*, 41 F.3d 1090, 1100 (9th Cir. 2006)

9   ("A party requesting a continuance pursuant to [Rule 56(d)] must identify by affidavit the specific

10   facts that further discovery would reveal, and explain why those facts would preclude summary

11   judgment").  The court may deny a request pursuant to Rule 56(d) where a party has failed

12   diligently to pursue discovery prior to summary judgment.  *Mackey v. Pioneer Nat. Bank*, 867

13   F.2d 520, 524 (9th Cir. 1989) ("A movant cannot complain if it fails diligently to pursue discovery

14   before summary judgment").

15         **B.       Plaintiff's Objections to Evidence**

16         Plaintiff asserts what he styles as objections to evidence on a number of issues.  The Court

17   finds that these objections are more properly characterized as legal arguments and therefore

18   declines to expressly rule on Plaintiff's objections.  Rather, the Court considers them in the

19   context of the substantive merits of the parties' motions.  The Court notes, however, that

20   Defendants do not dispute, in their Reply brief, that the events that occurred in the days prior to

21   the shooting were not known to the Defendant officers at the time the shot Mr. Dunklin.

22

23

24

25

26   _____

27   [7] Effective December 1, 2010, the Federal Rules of Civil Procedure were amended so that former
     Rule 56(f) now appears as Rule 56(d).  See *Roberts v. McAfee, Inc*., 660 F.3d 1156, 1169 n. 8 (9th
     Cir.2011) (noting change).

28

C.      **Fourth Amendment Claim**

      1.      **Legal Standard**

            a)      **Section 1983 Claim based on Alleged Excessive Force**

Section 1983 provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citation omitted)). Thus, analysis of an excessive force claim brought under § 1983 begins with the identification of the "specific constitutional right allegedly infringed by the challenged application of force." *Id.* at 394 (citation omitted). The claim is then evaluated under the specific constitutional standards that apply to that constitutional right. *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 7–22 (1985)). Plaintiff's excessive force claim is asserted under the Fourth Amendment and therefore is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 921 (9th Cir. 2001).

Determining whether the force used was reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The *Graham* Court did not limit the inquiry to these factors, however, recognizing that "the test of reasonableness under the Fourth  Amendment is not capable of precise definition or mechanical application." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005)(quoting *Graham*, 490 U.S. at 396). Other factors that may be considered include "the availability of alternative methods of capturing or subduing a suspect," *see id.* (citation omitted), the number of lives at risk due to the individual's conduct, the demeanor of the suspect, the size and stature of the parties involved, whether the suspect was fighting with the police, or was intoxicated  or noncompliant. *Davenport v. Causey*, 521 F.3d 554, 551 (6th Cir. 2008). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 40 U.S. at 396. Moreover, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* "The calculus of reasonableness must embody allowance for the fact

United States District Court
Northern District of California

that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*.

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith v. City of Hemet*, 394 F.3d at 701 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir.2002)).

### b) Qualified Immunity

Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis added). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The Supreme Court has stated that the "driving force behind the creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." *Id*. (internal citations omitted). Thus, courts should resolve questions of qualified immunity "at the earliest possible stage in litigation." *Id*. at 231-32 (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

There are two questions in the qualified immunity analysis: (1) whether there was a deprivation of a constitutional or statutory right, and (2) whether that constitutional or statutory right was "clearly established" at the time of the incident. *See Saucier v. Katz*, 533 U.S. 194 (2001); *Pearson*, 555 U.S. at 232. In *Saucier*, the Supreme Court held that the qualified immunity analysis required that the district court first determine whether there was a violation of the plaintiff's constitutional rights and that only if  such a violation was found should it proceed to the question of whether the violation involved a clearly established right.   533 U.S. at 201.  In

26

*Pearson*, however, the Court modified this rule, holding that the qualified immunity analysis need not be done in any particular order. 555 U.S. at 236. The Court reasoned that while the approach required under *Saucier*'s mandate may have a beneficial effect on the development of precedent, "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id*. at 237. Therefore, the Court concluded, a more flexible approach is warranted and will permit the lower courts to "determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Id*. at 242.

The inquiry as to whether a constitutional right is clearly established is "particularized." *Saucier*, 533 U.S. at 201. It is not enough that the general rule is established. *Id*. Rather, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although the existence of a clearly established constitutional right is usually demonstrated on the basis of cases involving similar facts where the alleged conduct has been found to be unconstitutional, "[w]hen the defendant 's conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Deorle v. Rutherford*, 272 F.3d 1272, 1285-1286 (9th Cir. 2001) (quotation and citation omitted).

The Supreme Court has cautioned that courts should afford "deference to the judgment of reasonable officers on the scene" and should not use "20/20 hindsight vision." *Saucier*, 533 U.S. at 205.

### c) Application of the Law to the Facts

Both parties contend that the video footage of the events leading up to Mr. Dunklin's shooting provide a sufficient basis for the Court to determine, as a matter of law, whether Officer Saw and Sergeant Mallinger used excessive force in shooting Mr. Dunklin. Further, they assert that the undisputed facts are sufficiently clear to allow the Court to decide whether the officer Defendants are entitled to qualified immunity. The Court finds that there are significant fact questions that preclude summary judgment on the question of whether Mr. Dunklin's Fourth

Amendment right to be free from excessive force was violated.  Assuming that excessive force was used, however, the Court concludes, based on the circumstances of this case as reflected in the undisputed facts, that Defendants' use of force did not violate a right that was "clearly established."  Consequently, Officer Saw and Sergeant Mallinger are entitled to qualified immunity.

As noted above, in determining whether summary judgment is appropriate, the Court must draw all reasonable inferences in favor of the party opposing summary judgment.  *See Scott v. Harris*, 550 U.S. at  378.   In *Scott*, the Court explained this usually means in an excessive force case where the defendants are requesting summary judgment that the court should adopt the plaintiff's version of the relevant events.  *Id*.  Where there is video footage of the events at issue, however, the court is *not* required to accept the plaintiff's version of events if it is clearly contradicted by the video footage, so long as there is no dispute about whether the video footage accurately reflects what actually occurred.  *Id*.  In *Scott*, the plaintiff had attempted to flee in his car and the defendant police officer had ultimately rammed plaintiff's car from behind in order to apprehend the individual, resulting in a crash that left the plaintiff a quadriplegic.  *Id*. at  374.   In response to the defendant's request for summary judgment on the plaintiff's excessive force claim, the plaintiff asserted that he was not endangering the public when he fled in his car because there were few pedestrians and he mainly remained in control of his vehicle.  *Id*. at 379.   While the district court and the court of appeals found that there were fact questions as to qualified immunity and the underlying constitutional violation, the Supreme Court concluded that the lower courts had erred because there was video footage of the chase that "quite clearly contradict[ed] the version of the story told by the plaintiff."  *Id*. at 378.   In light of the video, the Court held, no reasonable jury could have accepted the plaintiff's version of events.  *Id*. at 380-81.

*Scott* does not change the requirement that the court must draw all reasonable inferences in favor of the party opposing summary judgment but simply makes clear that this rule does not require the court to draw inferences that are so clearly contradicted by video footage that no reasonable jury could accept them.   Although in *Scott* the Court found that the question of whether a constitutional violation occurred was appropriate for determination by the court instead

28

of a jury, in other cases courts have relied on video footage to reverse summary judgment in favor of one of the parties but have found, nonetheless, that the question of whether a constitutional violation had occurred presented a fact question that had to be decided by a jury. *See, e.g., Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005) (reversing summary judgment in favor of defendant in civil rights case alleging an arrest without probable cause where police officer's account was contradicted by video footage offered by the plaintiff and finding there was a factual dispute that could only be decided by a jury); *Green v. Throckmorton*, 681 F.3d 853 (6th Cir. 2012) (holding that district court erred in granting summary judgment in favor of defendant officer on Fourth Amendment claim based on alleged unreasonable detention where video footage supported plaintiff's version of events, and finding a factual dispute that could only be decided by a jury).

Here, many of the facts relating to the events leading up to the shooting are not in dispute. It is undisputed that Mr. Dunklin was in a wheelchair, that he stabbed Officer Saw just after Officer Saw sprayed him with pepper spray, that he refused to drop his knife after being asked to do so many times, and that in a short period of time Mr. Dunklin was shot with the Less Lethal, raised his arm and tossed the knife, and that Officer Saw and Sergeant Mallinger each fired a single shot, hitting Mr. Dunklin. However, the parties do dispute whether Mr. Dunklin was the aggressor in the encounter on Howard Street. They also dispute whether Mr. Dunklin's raising of his arm to toss the knife, considering the entirety of the circumstances, would have led a reasonable officer to believe that his life was threatened. The Court finds that these questions are appropriate for a jury to decide and may not be resolved on summary judgment.

In contrast to the facts of *Scott*, the video footage in this case does not clearly contradict either Plaintiff's or Defendants' version of events. The Howard Street Video has no audio and it is very difficult to make out the individuals involved in that encounter. The iPhone video, while clearer, does not show all of the events that occurred on 10th Street. For example, when Officer Smith fires the Less Lethal, a truck is passing, obscuring the view. Similarly, the view of Sergeant Mallinger is obscured by a pole at the point in the video when he shot Plaintiff. Consequently, the video footage does not provide a sufficiently clear record of the events that led up to the

shooting to warrant taking away from the jury the question of whether the force used against Mr. Dunklin was reasonable.  That inquiry requires consideration of the totality of the circumstances, including circumstances that are difficult to evaluate based on the video footage alone.

In reaching this conclusion, the Court has considered the cases that the parties have cited to show that the Defendant officers acted either reasonably or unreasonably as a matter of law.  A review of some of these cases may be helpful both to explain the Court's conclusion that summary judgment is inappropriate as to whether the force used was reasonable and for determining whether there is a clearly established constitutional right such that Defendants Saw and Mallinger are not entitled to qualified immunity.

Plaintiff has cited, *inter alia*, *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005), *Davenport v. Causey*, 521 F.3d 544 (6th Cir. 2008), *Davis v. City of Las Vegas*, 478 F.3d 1048 (9th Cir. 2007), and *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) in support of his request for summary judgment on his Fourth Amendment claim.  None of these cases is closely on point with the facts of this case.  Nor do they support Plaintiff's assertion that the amount of force used against him was unreasonable as a matter of law.  In *Smith v. Hemet*, the alleged excessive force occurred when officer's responded to a call from the plaintiff's wife that he was hitting her.  394 F.3d at 693.  When the police arrived, the plaintiff initially refused to cooperate, but he agreed to comply after he was pepper sprayed, attacked by a police canine and pinned to the ground by several police officers.  *Id*. at 694.  Subsequently, the officers ordered the canine to bite plaintiff two more times, pepper sprayed him several times, and dragged him off his front porch face down. *Id*.  There was no evidence that the plaintiff in that case was carrying a weapon or that the officers believed the plaintiff was armed at the time of alleged conduct.  Thus, the facts of that case are distinguishable from the facts here to the extent that it is undisputed that Mr. Dunklin was armed with a knife and that he refused to drop it after being ordered to do so several times.  The Court notes that even in *Smith v. Hemet*, the court did not enter summary judgment in favor of the plaintiff, instead finding that there was a fact question as to whether excessive force had been used.

Plaintiff also cites *Davis v. City of Las Vegas*, 478 F.3d 1048 (9th Cir. 2007) to establish

that his Fourth Amendment rights were violated.  In *Davis*, a police officer responded to a call

from a casino stating that their security personnel had encountered the plaintiff reading a magazine

in a non-public area of the casino.  478 F.3d at 1051.  When the officer arrived, the plaintiff was

already in hand-cuffs, and a pat-down had been conducted.  *Id*.  However, when the officer tried to

reach into the plaintiff's pocket for his wallet after the plaintiff had refused to consent to a search,

the plaintiff (still in handcuffs and unarmed) twisted away from the officer; the officer then "

slammed him head-first into a wall several times, pinned him against the floor, . . . punched him in

the face . . .[and]  [a]t some point during this encounter . . .   fractured [his] neck."  *Id*.  On the

basis of these facts, the Ninth Circuit reversed the district court's grant of summary judgment in

favor of the officer and remanded for trial, both as to whether excessive force had been used and

as to the question of qualified immunity.  *Id*. at 1057-58, 1060.  Again, the facts in *Davis* are

distinguishable from the facts here.  In contrast to Mr. Dunklin, who was wielding a knife and

refused to drop it, the plaintiff in *Davis* was unarmed and already in handcuffs when the force was

applied.

Finally, Plaintiff cites *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001).  In that case, a

police officer, Officer Rutherford, fired a  Less Lethal round at an emotionally disturbed

individual, Leo Deorle, who was walking toward him, even though Deorle "was unarmed, had not

attacked or even touched anyone, had generally obeyed the instructions given him by various

police officers, and had not committed any serious offense."  272 F.3d at 1275.  The officer "did

not warn Deorle that he would be shot if he physically crossed an undisclosed line or order him to

halt [but] simply fired at Deorle when he arrived at a spot Rutherford had predetermined."  *Id*.

The projectile fired by Rutherford removed  Deorle's eye and implanted in his skull.  *Id*.  The

district court granted summary judgment in favor of the defendant officer on the basis of qualified

immunity and the plaintiff appealed.  *Id*.  The Ninth Circuit reversed, finding that the officer was

not entitled to summary judgment on the question of qualified immunity and remanding for further

proceedings.  *Id*. at 1286.

In addressing the question of whether the defendant was entitled to qualified immunity, the

Ninth Circuit in *Deorle* offered useful guidance on the question of how to determine whether force

is excessive in cases involving an individually who is emotionally disturbed.  The court stated:

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis. See *Alexander*, 29 F.3d at 1366 (holding that the police used excessive force, considering all the circumstances, in "storm[ing] the house of a man whom they knew to be a mentally ill ... recluse who had threatened to shoot anybody who entered"). Even when an emotionally disturbed individual is "acting out" and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual. We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals. Instead, we emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed.

*Id*. at 1281.   However, nothing in *Deorle* persuades the Court that under the facts of this case, summary judgment in favor of Plaintiff on his excessive force claim is appropriate.  In *Deorle*, as in the cases discussed above, the individual involved was not armed and he had not hurt anyone. In contrast, Mr. Dunklin was wielding a knife until the instant before he was shot and had already stabbed a police officer.

Conversely, the cases cited by Defendants to show that the force used against Mr. Dunklin was reasonable also do not persuade the Court that they are entitled to summary judgment on the basis that there was no constitutional violation.  Defendants cite a number of cases in which force was found to be reasonable based, in part, on the fact that the individual was wielding a knife.  *See Martinez v. County of Los Angeles*, 47 Cal.App.4th 334, 345 (1996);  *Estate of Larsen v. Murr*, 511 F.3d 1255, 1261-62 (10th Cir. 2008);  *MacEachern v. City of Manhattan Beach*, 623 F.Supp. 2d 1092, 1104 (C. D. Cal. 2009). In *Martinez*, police shot and killed a man who was approaching them with a knife in his hand, who appeared to be under the influence of drugs or alcohol,

32

1   continued advancing toward the officers after being told to stop, and who stated, "go ahead, kill

2   me or I'm going to kill you." 47 Cal. App. 4th at 339-340.  The court held that the shooting was

3   reasonable and justified and therefore granted summary judgment in favor of the defendant officer

4   on the individual's excessive force claim.  Similarly, in *Estate of Larsen*, the court found the

5   officers' use of force reasonable where an individual holding a knife with a  blade that was over

6   one foot long refused to drop the knife and was walking towards them when they shot and killed

7   the man. 511 F.3d at 1261.  In *MacEachern*, the court held that an officer's use of force was

8   reasonable where he shot a man who was walking toward him with a knife and refused to drop the

9   knife when ordered to do so by the officer.  623 F. Supp. 2d at 1104-1105.

10          All of these cases indicate that where an individual is wielding a knife and refuses to drop

11  it when ordered to do so, it may be reasonable under the Fourth Amendment for an officer to shoot

12  the individual, depending on the specific circumstances of the case.  However, the facts of these

13  cases are not similar enough to the facts here to support a finding by the Court that the force used

14  in this case was reasonable *as a matter of law*.  Rather, this question is more appropriately decided

15  by a jury based on the totality of the circumstances; among the factors a jury may consider are the

16  fact that Mr. Dunklin was in a wheelchair when he was shot, evidence that the officers knew that

17  Mr. Dunklin was emotionally disturbed and whether there were alternative methods available for

18  subduing Mr. Dunklin.  *See Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

19          Nonetheless, the cases cited by Defendants do support the conclusion that if Officer Saw

20  and Sergeant Mallinger violated Mr. Dunklin's constitutional right to be free from excessive force,

21  that right was not clearly established under the specific facts of this case.  To counter the cases

22  cited by Defendants, Plaintiff has cited no case involving facts remotely similar to the facts here to

23  show that the Defendant officers would have been on notice that their actions were

24  unconstitutional.  Nor has the Court found such a case.  Further, the Court does not find that the

25  conduct of the Defendant officers under the specific facts of this case was "so far beyond the hazy

26  border between excessive and acceptable force that [the officers] had to know [they were]

27  violating the Constitution even without caselaw on point."  *Willingham v. Loughnan*.  321 F.3d

28  1299, 1303 (11th Cir. 2003) (quoting *Priester v. City of Riviera Beach, Florida*, 208 F.3d 919, 926

United States District Court
Northern District of California

33

1   (11th Cir. 2000)).

2          The Court finds the decision in *Willingham* instructive.  There, the court held that officers

3   who shot a woman even though she was unarmed and had her hands on her head at the time she

4   was shot were entitled to qualified immunity because a "split second" before she had thrown a cup

5   at one officer and a knife at another, and she was standing in the doorway of the kitchen, where

6   she presumably could have obtained another knife.  *Id.*  The court noted that the plaintiff had not

7   cited any cases holding that  shooting a person "(1) who had just attempted to murder one police

8   officer and assaulted another, (2) who was not under police control, and (3) was close by a source

9   of weapons--was unconstitutional."  *Id.*  The court also rejected the argument that the conduct was

10  so egregious that it was not necessary to point to a case that was factually on point to show the

11  existence of a clearly established right.

12         Although the facts of *Willingham* are not entirely on point --  the woman in that case was

13  not in a wheelchair and apparently had  access to more knives  -- the Court finds the reasoning of

14  that case persuasive and reaches the same conclusion here.  As in *Willingham*, the fact that there

15  was a very brief time lapse between the perceived threat (Mr. Dunklin raising his arm with a knife

16  in his hand) and the shooting does not deprive the Defendant officers of immunity as the Fourth

17  Amendment does not require that a public official's actions be perfectly calibrated as to timing.

18  *See Berube v. Conley*, 506 F.3d 79 (1st Cir. 2007)( holding that there was qualified immunity

19  where the officer continued to shoot a man who had charged her with a large hammer, even

20  though she continued to shoot him after he was already on the ground, because the events

21  happened in a very short period of time and the evidence showed the officer made a split-second

22  decision under uncertain circumstances).  Further, even assuming that lethal force was

23  unreasonable under the circumstances, an officer could have formed a reasonable, if mistaken,

24  belief that lethal force was permissible, given that Mr. Dunklin had already stabbed one office and

25  refused to drop the knife after being told to do so many times. There are no cases with facts similar

26  to those of the instant case which establish that the officers' use of force was unconstitutional.

27  The only case cited by the parties that is even close is *Willingham*.

28         Accordingly, the Court finds that Defendants Mallinger and Saw are entitled to summary

34

judgment based on qualified immunity because, assuming the shooting of Mr. Dunklin violated his Fourth Amendment right to be free from excessive force, that right was not clearly established under the facts of this case.

### D.   *Monell* Claims

#### 1.   Legal Standard

Under *Monell*, a municipality cannot be held liable for constitutional injuries inflicted by its employees on a theory of respondeat superior. *Monell*, 436 U.S. at 691.  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.  A plaintiff seeking to establish municipal liability under section 1983 may do so in one of three ways: 1) the plaintiff may demonstrate that a municipal employee committed the alleged constitutional violation "pursuant to a formal governmental policy or longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" 2) the plaintiff may demonstrate that the individual who committed the constitutional violation was an official with "final policy-making authority and that the challenged action itself thus constituted an act of official government policy;" or 3) the plaintiff may demonstrate that "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992).

Where it is found that a public official committed no constitutional violation, there also can be no *Monell* liability on the part of the municipality based on that official's conduct.  *See  Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).  However, where a court finds that a public official is entitled to qualified immunity based only on the absence of  a clearly established constitutional right, a municipality may still be liable for a constitutional violation under *Monell*.   *Gibson v. County of Washoe, Nev.,* 290 F.3d 1175, 1186 n. 7 ("a municipality may be liable if an individual officer is exonerated on the basis of the defense of qualified immunity, because even if an officer is entitled to immunity a constitutional violation might still have occurred") (citing *Chew v. Gates*, 27 F.3d 1432, 1438–39 (9th Cir.1994));  *see also Estate of Esquivel v. Chavez*,  2008 WL

4821714, at *25 (E.D.Cal., Nov. 4, 2008).

## 2.  Application of the Law to the Facts

Although a fact question remains as to whether a constitutional violation occurred in this case, the City cannot be liable if Plaintiff fails to establish that the requirements of *Monell* for imposing municipal liability are met.  Plaintiff has advanced two theories under *Monell* in response to Defendants' summary judgment motion.  First, he contends that the use of force training received by SFPD officers is not only inadequate but affirmatively teaches officers to apply the wrong legal standard, directly resulting in the violation of Mr. Dunklin's constitutional right to be free of excessive force.  Second, he contends that he *may* be able to establish *Monell* liability on a theory of ratification if he is permitted to conduct further discovery; he argues that such discovery should be permitted because the Court previously denied his request to depose the Chief of Police and others involved in the internal investigation of Mr. Dunklin's shooting.

### a)  The City's Use of Force Training

Plaintiff seeks to establish the use of force training provided to SFPD officers amounts to an unconstitutional policy on the part of the City based, in large part, on the deposition testimony of Mr. Quinn, the individual who administers that training and who was designated by the City as "person most knowledgeable" about the City's training  in this case.[8]  The Court finds that no

---

[8] In his amended complaint, Plaintiff alleged that "[i]n the year before the shooting of Plaintiff Dunklin, San Francisco police officers had shot and killed at least three other men (Edward Smith, Michael and Vinh Bui) in situations where the resort to deadly force was avoidable had proper tactics been employed.  FAC ¶ 17.  Thus, it appeared at the outset of this case that Plaintiff intended to pursue a *Monell* theory based on custom of using excessive force in certain situations as evidenced by shootings of *other* individuals.  However, when Defendants sought to bifurcate the *Monell* claims, Plaintiff made clear in his responsive brief that his *Monell* claims were based on the shooting of Mr. Dunklin and the allegedly inadequate training provided to officers by the City with respect to the use of force and that he did not seek to establish a *Monell* claim based on shootings of other individuals.  *See* Docket No. 34.  Although Plaintiff's counsel suggested at the discovery hearing on October 16, 2012, that his *Monell* claim might be based on evidence concerning shootings of other individuals, Plaintiff has offered no evidence relating to other cases from which a reasonable jury could conclude that there was a custom of using excessive force.  The Court notes that Mr. Safire did submit an (untimely) declaration attaching the quarterly reports of the Firearms Discharge Review Board, which summarize the findings of that board as to all shootings that it has investigated.  *See* Safire Supp. Decl., ¶ 2 & Ex. A.  Mr. Safire has also prepared a chart of what he contends is a summary of the quarterly reports.  *Id.* ¶ 3 & Ex. B.  Plaintiff did not, however, argue in opposition to Defendants' summary judgment motion (or even in his supplemental declaration) that these reports reflect any custom of using excessive force.  As Plaintiff never made this argument, Defendants also did not have an opportunity to respond to any

United States District Court
Northern District of California

1    reasonable jury could conclude, based on the evidence that has been submitted by the parties in

2    this action, that the San Francisco Police Department's training is so inadequate as to give rise to

3    liability on the party of the City under § 1983.

4           The Supreme Court has held that inadequate training may constitute a "policy" under

5    *Monell* that gives rise to municipal liability." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388

6    (1989).  To establish *Monell* liability based on inadequate training, a plaintiff must show that "the

7    failure to train amounts to deliberate indifference to the rights of persons with whom the police

8    come into contact."  *Id*.  The Court in *City of Canton* explained that this requirement is consistent

9    with its admonition in previous cases that under *Monell*, the alleged unconstitutional conduct must

10   be the "moving force" behind the violation.  *Id*. at 388-389 (citing *Monell*, 436 U.S., at 694; *Polk*

11   *County v. Dodson*, 454 U.S. 312, 326 (1981)).  The Court went on to state:

12          "[i]t may seem contrary to common sense to assert that a
             municipality will actually have a policy of not taking reasonable
13           steps to train its employees. But it may happen that in light of the
             duties assigned to specific officers or employees the need for more
14           or different training is so obvious, and the inadequacy so likely to
             result in the violation of constitutional rights, that the policymakers
15           of the city can reasonably be said to have been deliberately
             indifferent to the need.

16

17   *Id*. at 390.

18          Here, Mr. Quinn testified that San Francisco Police Department officers receive force

19   training every two years in a four-hour class which includes an initial Power Point presentation.

20   Scott Opposition Decl., Ex. C (Quinn Dep.) at 28-34.  Plaintiff has pointed to no testimony by Mr.

21   Quinn that suggests that officers are taught to apply a subjective standard in determining whether

22   the use of force is appropriate, and the Court has found no such testimony in his deposition

23   testimony.  Further, Plaintiff's assertion is flatly contradicted by the Power Point slides that

24

25

26   argument that these reports might create a fact question as to the existence of a custom of using
     excessive force.  Under these circumstances, the Court finds that neither the Quarterly Reports nor
27   Mr. Safire's chart (even assuming that it is admissible) are sufficient to show a fact question as to
     whether there is a custom of using excessive force under *Monell*.  Nor do these reports shed any
28   light on the City's training policy, to the extent that is the purpose for which they have been
     offered.

United States District Court
Northern District of California

1    Plaintiff concedes are used as part of the training.  The PowerPoint slides[9] include numerous slides

2    summarizing the standards set forth in *Graham v. Connor*.  Loebs Supp. Decl., Ex. F, Bates Nos.

3    6144-6145.  They explain that force is judged from the perspective of a reasonable officer on the

4    scene at the time the force was applied.  They also address the difference between a subjective and

5    objective standard.  *Id.* at 6145.  In short, no reasonable jury could conclude that SFPD officers are

6    trained to apply a subjective standard with respect to use of force based on the testimony of Mr.

7    Quinn and the Power Point slides that are used by him.

8         Plaintiff's reliance on Mr. Quinn's testimony that officers can fail a scenario if they are

9    unable to articulate a reason for their decision is misplaced.  Mr. Quinn testified that an officer

10   may fail a scenario on the basis that he or she could not explain why he or she used force

11   "[b]ecause we want to make sure the officer employs force for the right reason."  Scott Opposition

12   Decl., Ex. C (Quinn Dep.) at 63;  *see also* Loebs Supp. Decl., Ex. E at Bates No. 6139 (instructor

13   notes for force training, stating that instructor should "[e]nsure legal standards are met/learned –

14   shown by student being able to explain and apply standard").  This evidence establishes only that

15   the training is designed to teach officers the applicable legal standards, including the requirement

16   that the use of force must be objectively reasonable.

17        Similarly, the testimony of Officer Saw cited by Plaintiff does not provide a reasonable

18   basis  to support *Monell* liability.  Undoubtedly, the transcript reflects that the investigator asked

19   some leading questions.[10]  It is also true that Officer Saw stated that "we're all taught to say"

20   "scared for my life."  Read in context, however, nothing in Officer Saw's statement suggests that

21   the City teaches officers (including Officer Saw) that merely by using this phrase, an officer's use

22   of force will be condoned, regardless of whether or not it was objectively reasonable.

23        The Court finds that the evidence provided by Plaintiff falls far short of the showing

24

25   [9] At oral argument, Plaintiff stipulated that he does not challenge the authenticity of the
26   PowerPoint slides used as part of Mr. Quinn's force training and that the Court may consider those
     slides in determining whether summary judgment is appropriate.

27   [10] The investigator asked Officer Saw, "[y]ou were scared weren't you."  Officer responded,
28   "[y]eah, I was scared."  The investigator continued, "[y]ou were scared for your life."  Officer Saw
     responded, "[y]es."  Scott Decl., Ex. D (Statement of Officer Saw) at 63-64.

United States District Court
Northern District of California

1   required survive summary judgment on his *Monell* claim to the extent that claim is based on the

2   theory that the force training provided to SFPD officers reflects deliberate indifference to the

3   constitutional rights of Mr. Dunklin.

**b)      Ratification**

5        Plaintiff asks the Court to defer ruling on Defendants' summary judgment motion pursuant

6   to Rule 56(d) and to allow him to pursue additional discovery.  In particular, he contends that he

7   should be permitted to depose Police Chief Suhr "and others who participated in the process

8   resulting in the shooting of Dunklin being ratified."  Plaintiff's Opposition at 15. The Court denies

9   Plaintiff's request because he has not identified the specific facts that further discovery would

10  reveal and why they would preclude summary judgment, as is required under Rule 56(d).

11       In order to determine whether Plaintiff has met his burden under Rule 56(d), the Court

12  looks first to the case law governing ratification under *Monell*.  Although courts have found that

13  ratification is one of the grounds upon which liability can be found under *Monell*, *see, e.g. Gillette*,

14  979 F.2d at 1346, the term "ratification" was not used by the Court in *Monell* and was not the

15  subject of extensive discussion.  Rather, much of the law governing ratification is an outgrowth of

16  Supreme Court's decisions in *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) and *City of St.*

17  *Louis v. Praprotnik*, 485 U.S. 112 (1988), which the Court examines below.  The Court will then

18  look for further guidance to cases in the Ninth Circuit that have applied a theory of ratification in

19  the § 1983 context.

20       In *Pembaur*, the plaintiff was a physician who had refused to allow the county deputy

21  sheriffs to enter his clinic to serve capiases (a "writ of attachment commanding a county official to

22  bring a subpoenaed witness who has failed to appear before the court to testify and to answer for

23  civil contempt") on two of his employees who were inside the clinic.  475 U.S. at 472.  Ultimately,

24  the sheriffs contacted the county prosecutor, who instructed the sheriffs to "go in and get" the

25  employees.   *Id*. at 473.  The sheriffs broke down the door of the clinic with an axe and entered the

26  clinic.  *Id*.  Subsequently, the doctor brought a § 1983 claim against the county, asserting that the

27  county prosecutor's instructions constituted a policy which could give rise to liability on the part

28  of the county under *Monell*.  The lower courts rejected the plaintiff's position, finding that a single

United States District Court
Northern District of California

39

1    act could not be considered to be a policy under *Monell*, even if it was by a final policy maker.  *Id.*

2    at 476-477.   A plurality of the Court disagreed.

3        The *Pembaur* Court concluded that a single act could be considered a policy, under

4    *Monell*, "under appropriate circumstances," reasoning as follows:

> *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"—that is, acts which the municipality has officially sanctioned or ordered. With this understanding, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy. See, e.g., *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (City Council passed resolution firing plaintiff without a pretermination hearing); *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (City Council canceled license permitting concert because of dispute over content of performance). But the power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level. *Monell*'s language makes clear that it expressly envisioned other officials "whose acts or edicts may fairly be said to represent official policy," *Monell*, *supra*, 436 U.S., at 694, 98 S.Ct., at 2037–2038, and whose decisions therefore may give rise to municipal liability under § 1983.

17   *Id*. at 480.

18       The Court in *Pembaur* cautioned that § 1983 does not provide for municipal liability based

19   simply on the fact that a public official has discretion as to particular functions, as imposition of

20   liability on this basis would amount to *respondeat superior* liability.  *Id*.  at 481-482.  Rather, the

21   Court held that "municipal liability under § 1983 attaches where—and only where—a deliberate

22   choice to follow a course of action is made from among various alternatives by the official or

23   officials responsible for establishing final policy with respect to the subject matter in question."

24   *Id*. at 482.  The question of whether an official is responsible for making final policy, it held, is a

25   question  of state law.  *Id*.  The Court offered the following example:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with

40

1

> respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.

*Id*. at 483 n. 12.  Applying this standard, the Court found that the lower courts had improperly dismissed the plaintiff's *Monell* claim because the county prosecutor was a final policy maker under state law and his instructions directly caused the alleged constitutional violation.  *Id*. at 484-485.

The Supreme Court decided *Praprotnik* two years later.  In that case, the plaintiff was an architect employed by the city who was transferred and then laid off, allegedly in retaliation for bringing a complaint against his supervisor before the city's Civil Service Commission, which reviewed employee grievances.  485 U.S. at 114-115.  The plaintiff  sued the city and the individual supervisors under § 1983 and the First Amendment alleging retaliation and a jury found that the city (but not the individual supervisors) was liable for violating the plaintiff's constitutional rights.  *Id*. at 116-117.  The court of appeals affirmed the verdict, finding that under *Pembaur*, the city could be held liable for the conduct of the supervisors, "[a]pplying a test under which a 'policymaker' is one whose employment decisions are 'final' in the sense that they are not subjected to de novo review by higher ranking officials."  *Id*. at 117.  The court of appeals rejected the city's argument that its personnel policies were actually set by the Civil Service Commission, finding that "the scope of review before that body was too 'highly circumscribed' to allow it fairly to be said that the Commission, rather than the officials who initiated the actions leading to respondent's injury, were the 'final authority' responsible for setting city policy."  *Id*. A dissenting judge, however, argued that the supervisors were not the final authority because the power to set city employment policy "lay with the Mayor and Aldermen, who were authorized to enact ordinances, and with the Civil Service Commission, whose function was to hear appeals from city employees who believed that their rights under the city's Charter, or under applicable rules and

United States District Court
Northern District of California

ordinances, had not been properly respected." *Id*. at 118.

The Supreme Court in *Praprotnik* began its analysis by reviewing the plurality decision in

*Pembaur*, summarizing its approach as follows:

> Two Terms ago, in *Pembaur*, *supra*, we undertook to define more precisely when a decision on a single occasion may be enough to establish an unconstitutional municipal policy. Although the Court was unable to settle on a general formulation, Justice BRENNAN's opinion articulated several guiding principles. First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." Id., 475 U.S., at 480, 106 S.Ct., at 1298. Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. *Id*., at 483, 106 S.Ct., at 1300 (plurality opinion). *Third*, whether a particular official has "final policymaking authority" is a question of state law. *Ibid*. (plurality opinion). Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business. *Id*., at 482–483, and n. 12, 106 S.Ct., at 1299–1300, and n. 12 (plurality opinion).

485 U.S. at 123.  The Court went on to observe that the courts of appeals had diverged in their

application of *Pembaur* and therefore, it "set out again to clarify the issue."  *Id*.

The *Praprotnik* Court emphasized that the question of whether an individual or entity is a

final policy maker is a question of state law and therefore, "the identification of policymaking

officials is not a question of federal law, and it is not a question of fact in the usual sense."  *Id*. at

124.  While the Court did not attempt to enumerate the many ways "in which the power of

government is distributed among a host of different officials and official bodies," it opined, "we

can be confident that state law (which may include valid local ordinances and regulations) will

always direct a court to some official or body that has the responsibility for making law or setting

policy in any given area of a local government's business."  The Court recognized, as it had in

*Pembaur*, that the delegation of policymaking authority may present "special difficulties," and

remarked that there was not an "elegant line" dividing those situations where imposition of

municipal liability would amount to *respondeat superior* liability and those where allowing the

municipality to avoid liability for constitutional violations through the delegation of authority

would defeat the purpose of § 1983.  *Id*.  The Court offered certain governing principals to assist

courts in making this distinction, however.  *Id*.

1    First, the Court pointed out that "whatever analysis is used to identify municipal

2    policymakers, egregious attempts by local governments to insulate themselves from liability for

3    unconstitutional policies are precluded by a separate doctrine."  *Id.* at 127.  The Court explained:

>   Relying on the language of § 1983, the Court has long recognized
>   that a plaintiff may be able to prove the existence of a widespread
>   practice that, although not authorized by written law or express
>   municipal policy, is "so permanent and well settled as to constitute a
>   'custom or usage' with the force of law." *Adickes v. S.H. Kress &
>   Co.*, 398 U.S. 144, 167–168, 90 S.Ct. 1598, 1613–1614, 26 L.Ed.2d
>   142 (1970). That principle, which has not been affected by *Monell*
>   or subsequent cases, ensures that most deliberate municipal evasions
>   of the Constitution will be sharply limited.

9    *Id.*  The Court went on to offer the following additional guidance:

>   Second, as the *Pembaur* plurality recognized, the authority to make
>   municipal policy is necessarily the authority to make final policy.
>   475 U.S., at 481–484, 106 S.Ct., at 1299–1301. When an official's
>   discretionary decisions are constrained by policies not of that
>   official's making, those policies, rather than the subordinate's
>   departures from them, are the act of the municipality. Similarly,
>   when a subordinate's decision is subject to review by the
>   municipality's authorized policymakers, they have retained the
>   authority to measure the official's conduct for conformance with
>   their policies. If the authorized policymakers approve a
>   subordinate's decision and the basis for it, their ratification would be
>   chargeable to the municipality because their decision is final.

17    *Id.*

18    Applying these principals, the Court in *Praprotnik* held that the municipality could not be

19    liable for the alleged First Amendment violation because the plaintiff had not proved the existence

20    of an unconstitutional municipal policy.  *Id.* at 127.  The Court explained that regardless of the

21    conduct of the plaintiff's supervisors, "it says nothing about the actions of those whom the law

22    established as the makers of municipal policy in matters of personnel administration."  *Id.* at 128.

23    It further noted that "[t]he Mayor and Aldermen enacted no ordinance designed to retaliate against

24    respondent or against similarly situated employees.  On the contrary, the city established an

25    independent Civil Service Commission and empowered it to review and correct improper

26    personnel actions."  *Id.*  The Court observed that it "would have been different," however, "if a

27    particular decision by a subordinate was cast in the form of a policy statement and expressly

28    approved by the supervising policymaker" or "if a series of decisions by a subordinate official

1  manifested a 'custom or usage' of which the supervisor must have been aware." *Id*. at 927-928.

2          In *Gillette*, the Ninth Circuit relied on *Praprotnik* in a case involving a city fire fighter,

3  Gillette, who alleged that he was terminated from his employment in violation of § 1983 and the

4  First Amendment.  979 F.2d at 1344.  Gillette was fired by the battalion chief; he then appealed

5  the decision to the Fire Chief, who affirmed the decision after a hearing.  *Id*.  Gillette then filed a

6  formal grievance pursuant to a collective bargaining agreement between the City and the fire

7  fighters' union, resulting in a finding by the arbitrator that the plaintiff should be reinstated

8  without back pay.  *Id*.  Gillette sought to hold the city liable for the alleged constitutional violation

9  on the basis that the City Manager did not countermand the Fire Chief's decision to terminate the

10  plaintiff and did not object to the hiring of counsel to represent the City in the arbitration.  *Id*. at

11  1347.  The Ninth Circuit rejected the plaintiff's position, holding that the City Manager's conduct

12  did not amount to a "ratification" under *Praprotnik* and *Pembaur*.  *Id*. at 1348.    The court

13  explained its conclusion as follows:

14                  Gillette has established that the City Manager did not overrule a
                discretionary decision by the Fire Chief and did not object to the
15                  retention of counsel to represent the City in an arbitration
                proceeding pursuant to a collective bargaining agreement. The Fire
16                  Chief did not cast his decision to discipline Gillette in the form of a
                policy statement, and the City Manager's testimony that he did not
17                  object to hiring counsel for Gillette's arbitration is at least equally
                consistent with a general policy of routinely hiring lawyers to
18                  defend the City in all litigation or labor grievance proceedings.
                There is no evidence that the City Manager made a deliberate choice
19                  to endorse the Fire Chief's decision and the basis for it.

20  *Id.*

21          Finally, the Court addresses two cases decided by district courts within the Ninth Circuit

22  involving internal police investigations such as the one that occurred in this case.  *See Kanae v.*

23  *Hodson,* 294 F.Supp.2d 1179, 1188 (D. Hawai'i 2003); *Garcia v. City of Imperial,* 2010 WL

24  3911457, *3 (S.D.Cal., Oct. 4, 2010).   In *Kanae*, the plaintiff in an excessive force case sought to

25  hold the city liable under *Monell* on the basis that the Police Chief had informed the officer,

26  following an internal investigation, that his conduct had been found to be consistent with the

27  police department's use of force regulations and that no adverse action would be taken against

28  him.  294 F. Supp. at 1187-1188.  According to the plaintiff, by accepting the conclusions of the

United States District Court
Northern District of California

internal board and following the recommendations of the board, the police chief had ratified the force used by the defendant officer.   The court disagreed, finding that "[t]he Ninth Circuit appears to require something more than a failure to reprimand to establish a municipal policy or ratification."   *Id*. at 1188 (citations omitted).  The *Kanae* court concluded:

> The law does not say that, whenever an investigative group accepts an officer's version over a victim's differing version, this acceptance establishes a policy for which a municipality may be held liable under § 1983. If that were the law, counties might as well never conduct internal investigations and might as well always admit liability. But that is not the law. The law clearly requires "something more."

*Id.*  Similarly, in *Garcia v. City of Imperial*, the court adopted the reasoning of *Kanae*, holding that a finding by the police chief that the officer's conduct was within policy did not constitute ratification because the facts in that case involved "no extreme facts or special circumstances that support[ed] a finding of ratification."   2010 WL 3911457, *3 (S.D.Cal., Oct. 4, 2010).

Here, Plaintiff has requested discovery on the question of whether the Police Chief is a final policy maker.  He has stipulated, however, that the FBRD decision only found that the shooting of Mr. Dunklin was within policy and did not purport to make policy.  Consequently, even assuming that Police Chief Suhr acted as a final decision maker in adopting that finding, this is not enough to give rise to *Monell* liability under a theory of ratification.  In particular, this Court, like the courts in *Kanae* and *Garcia* finds that merely affirming a finding that a particular use of force was "within policy" does not constitute ratification under the Supreme Court authority discussed above.  Therefore, additional discover under this theory is not warranted and Plaintiff's *Monell* claim fails, as a matter of law, to the extent it is based on a theory of ratification.

**IV.        CONCLUSION**

For the reasons stated above, Defendants' Motion is GRANTED.  Plaintiff's Motion is DENIED.  The case is dismissed with prejudice.

IT IS SO ORDERED.


Dated: April 10, 2013

_____

Joseph C. Spero
United States Magistrate Judge